IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

TOMMY LOUIS JERRELL                                        PLAINTIFF

     v.                              Civil No. 09-5060

SHERIFF TIM HELDER; and
NURSE RHONDA BRADLEY                                       DEFENDANTS

<u>**MEMORANDUM OPINION**</u>

The plaintiff, Tommy Louis Jerrell, filed this civil rights action pursuant to 42 U.S.C. §

1983. He proceeds *pro se* and *in forma pauperis*. The case is before me pursuant to the consent

of the parties (Doc. 11).

Plaintiff is currently an inmate of the Pine Bluff Unit of the Arkansas Department of

Correction (ADC). The events at issue in this action occurred during two separate time periods

while the plaintiff was incarcerated in the Washington County Detention Center. The first period

of incarceration was from September 5, 2008, to September 7, 2008. The second period of

incarceration was from November 17, 2008, until his transfer to the ADC on June 11, 2009.

While at the WCDC, Plaintiff contends he was denied adequate medical care, he was subjected

to unconstitutional conditions of confinement, his grievances were not responded to, and he was

threatened by Nurse Bradley.

Defendants filed a summary judgment motion (Doc. 18). To assist the plaintiff in

responding to the motion, a questionnaire (Doc. 34) was propounded. Plaintiff filed a timely

response to the motion (Doc. 35). The motion is now ready for decision.

-1-

## I. Background

On May 22, 2007, Jerrell entered a negotiated plea of guilty to the charges of possession of crack cocaine, possession of drug paraphernalia, and possession of a prohibited weapon. *Plaintiff's Response* (Doc. 35) at ¶ 1 (hereinafter *Resp.*).  He was sentenced to eleven days in the WCDC and seventy-two months of probation.  *Id.*

On September 5, 2008, Jerrell was seen at the emergency room at Washington Regional Medical Center, in Fayetteville, Arkansas.[1]  He was admitted at 7:54 a.m. and discharged at 11:15 a.m.  He was assessed as having 14.25% of his body covered with burns with second degree burns present on his posterior left hand and anterior trunk.  When he arrived at the hospital, Jerrell assessed his pain as a ten on a zero to ten scale with zero being no pain.  His burns were cleaned and debrided and he was provided a series of medications including Morphine Sulfate,[2] Sodium Chloride,[3] Promethazine Hydrochloride Novaplus;[4] Tetanus-Diphtheria Toxoids, Cefazolin Sodium,[5] and Dilaudid®.[6] Thermal dressings were applied and

---

[1]At the request of Jerrell, these records were obtained by the court pursuant to a subpoena (Doc. 32).  The records were received by the court on June 22, 2010, and copies were provided to Jerrell and the defendants.

[2]Morphine Sulfate is a strong analgesic painkiller.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601161.html (visited 9/9/10).

[3]Sodium Chloride is used as a flush to keep an intravenous catheter from becoming blocked.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682111.html (visited 9/9/10).

[4]Promethazine is used to control allergic reactions, used to relax and sedate patients, and is used with other medications to relieve pain.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682284.html (visited 9/9/10).

[5]Cefazolin is an antibiotic used to treat infection.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682731.html (visited 9/9/10).

[6]Dilaudid is the brand name for Hydromorphone Hydrochloride.  It is a strong analgesic to relieve pain.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601148.html (visited 9/9/10).

-2-

he was discharged with prescriptions for Silvadene®[7] Cream and Percocet®.[8]  The dressings were to be changed daily and Jerrell was to follow up with his doctor or the wound care clinic for daily care.

From September 5th to September 7th, Jerrell was incarcerated in the WCDC.  *Resp.* at ¶ 73(A).  During this incarceration, Jerrell maintains he verbally requested medical treatment for his burns.  *Id.*  He states he requested a doctor, to be taken to the hospital, and pain medication. *Id.* at ¶ 73(B).  With respect to pain medication, he states the defendants had in their possession a prescription for Percocet® but he was not given the medication.  *Resp.* at page 51.He asserts he was not provided with any official requests forms or a pencil.  *Id.* at ¶ 73(A).

On September 7th, Jerrell was released on his own recognizance so he could go to the hospital because his burns were very severe and infected.  *Resp.* at ¶ 73(B).  Jerrell indicates an officer drove him back to the apartment where drug paraphernalia was found during his arrest. *Id.*

With respect to Sheriff Helder, Jerrell states he believes he was at the jail and saw Jerrrell's burns. *Resp.* at ¶ 73(B).  Jerrell also believes that Sheriff Helder was at least indirectly involved in the decision of whether or not Jerrell's burns should be treated.  *Id.*

On September 8, 2008, Jerrell was admitted, through the emergency room, to the Burn Unit of St. Johns Regional Health Center in Springfield, Missouri.  *Resp.* at ¶ 2; *Defendants Exhibit* 7 at page 19 (hereinafter *Defts' Ex.*).  He remained hospitalized until September 12th.

---

[7]Silvadene is a registered brand name for Silver Sulfadiazine.  The medication is used to prevent and treat infections of second and third degree burns.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682598.html (visited 9/8/2010).

[8]Percocet is a brand name for a combination of Acetaminophen and Oxycodone.  Oxycodone is used to relieve moderate to severe pain.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html (visited 9/8/2010).

AO72A
(Rev. 8/82)

*Resp.* at ¶ 3.  On admission Jerrell had a 7% total body surface area burn to the chest wall, left hand and fingers, and his abdominal wall.  *Id.* at ¶ 4.  Infection was noted as was a large amount of pus-like drainage.  *Defts' Ex.* 7 at page 33.

Jerrell asserts he sustained the injuries on September 5th after he walked into a house where they were making methamphetamine.  *Id.* at ¶ 5 & ¶ 8(C).  He reported having gone to Carroll Regional Medical Center (CRMC) in Berryville, Arkansas, and having been in the WCDC three days prior to that.  *Id.* at ¶ 8(A).  He indicates he was released by the WCDC to go to a hospital due to an infection in his hand.  *Id.*  During the three days, September 5th to September 7th, he was at the WCDC, Jerrell states he was only offered one pill.  *Id.* at ¶ 8(D).  The pill was either Ibuprofen or an antibiotic.  *Id.*

In CRMC, his dressings were changed, he was given shots of antibiotics and pain, and a prescription for pain medication.  *Resp.* at ¶ 8(C).  Jerrell inidcates he was referred to St. Johns because the hospital was better equipped to deal with the type of injuries he had.  *Id.*

On September 9th Jerrell underwent a "[t]angential excision with split thickness skin grafting to the left hand, abdomen and left chest."  *Id.* at ¶ 6.  He was discharged on September 12th in good condition with instructions for post-hospital follow-up.  *Id.* at ¶ 7.  He required no discharge medications.  *Id.*

Jerrell was booked into the WCDC on November 17th on various criminal charges and a probation revocation charge.  *Resp.* at ¶ 9.  When he was booked in, Jerrell signed a form indicating he was responsible for medical treatment for any injury or illness prior to his incarceration at the WCDC.  *Defts' Ex.* 2 at page 1.  Jerrell indicates he signed a "bunch of papers" when he was booked in and had no time to read them.  *Id.*

-4-

Jerrell completed a medical intake questionnaire. *Resp.* at ¶ 11.  In it he stated:  he had been treated for mental illness or depression (ADD, ADHD, Manic Depressive and Bi-polar); he had high blood pressure but was not currently taking medicine; he had been addicted to methamphetamine and marijuana; he was on a special diet of soft foods due to several face fractures from two months ago; he was a borderline asthmatic and occasionally needed an inhaler; he had seizures but had not had one for about a year; he had burns on his abdomen and left hand; he had a toothache; and his bladder had been bothering him. *Id.*  Jerrell indicated Dr. Horton was his primary care provider, who he had been seeing once a month. *Id.* at ¶ 12.  Most of his visits for different "trauma and things" were to emergency rooms. *Id.*

Jerrell stated he took pain medication and antibiotics but had not taken them for a week. *Resp.* at ¶ 13.  He indicated he was allergic to penicillin. *Id.*  He indicated he had medicare and medicaid. *Id.* at ¶ 14.  He stated he had attempted suicide while in the Carroll County Jail a couple of years ago but was not feeling suicidal that day. *Id.* at ¶ 15.

The intake sheet indicates Jerrell had upper dentures and two necklaces with him when he was booked. *Resp.* at ¶ 16.  Jerrell had no medication with him. *Id.*  Under medical complaints, it said Jerrell had a sore right hand. *Id.*  Jerrell, however, maintains it was his left hand that was sore. *Id.*

According to defendants, Jerrell submitted his first medical request on December 7th. *Defts' Ex.* 2 at page 3.  Jerrell asserts his first request was "probably" submitted before December 7th. *Resp.* at ¶ 17.  He indicates he did not always get his requests back. *Id.*  He maintains his first request was about constipation as a result of not having toilet paper for days at a time. *Id.*

-5-

In response to his December 7th request, Jerrell was seen by Nurse Bradley, placed on the list to see the doctor, and prescribed Ibuprofen as needed for pain. *Defts' Ex.* 2 at page 3. Nurse Bradley also wrote on Jerrell's medical request that she called Ozark Guidance Center (OGC) and spoke with Courtney who indicated Jerrell had last been seen there on October 31, 2008, and had not been prescribed medication since 2002. *Resp.* at ¶ 19.

Jerrell was seen by Dr. Howard on December 9th. *Resp.* at ¶ 20. Dr. Howard noted Jerrell's tooth needed to be pulled and he was to see the dentist. *Id.* Jerrell was prescribed doxycycline. *Id.*

Jerrell was seen by Dr. Howard on December 22nd for an injury to his face that had occurred two months ago. *Resp.* at ¶ 21(A). Dr. Howard indicated he would send for Jerrell's records and prescribed Ibuprofen, as needed for pain, and two Aleve at bedtime. *Id.* Jerrell indicates his face was originally injured in a fight but then was reinjured in jail when he bit into a rock that was in his carrots. *Id.* at ¶ 21(B). Jerrell asserts that he had been seen by a specialist prior to being incarcerated and was supposed to be on a strictly soft food diet. *Id.* He maintains the nurse failed to acknowledge this. *Id.*

Nurse Bradley called Dr. Davis' office that day and requested Jerrell's records regarding his right facial fracture. *Defts' Ex.* 2 at page 4. Jerrell signed a release for his records which was faxed. *Id.* Jerrell indicates he doesn't recall signing the release, but he may have. *Resp.* at ¶ 22. However, he states he does not know who Dr. Davis is. *Id.*

On December 24th, Jerrell complained of a migraine and was given two migraine caplets. *Resp.* at ¶ 23. On December 31st, Jerrell was taken to OGC for an evaluation ordered in connection with his criminal case. *Id.* at ¶ 24. After the evaluation, Dr. Ross requested a crisis

-6-

counselor see him for current depression.  *Id.*  A follow-up appointment was scheduled for February 3rd.  *Id.* at ¶ 25.  When the WCDC was contacted to confirm the appointment time, they responded that "unless it concerns crisis and medication" they would not provide transportation for counseling.  *Id.*

On January 14, 2009, Jerrell was sentenced to a term of imprisonment at the ADC on the charges of conspiracy to manufacture methamphetamine and possession of a controlled substance.  *Resp.* at ¶ 26.  On February 3rd, Jerrell was transported to OGC for a follow-up appointment.  *Defts' Ex.* 2 at page 6.  A note was made that there were to be no narcotics or benzodiazepines prescribed and that Jerrell was ADC property.  *Id.*  Jerrell maintains he was transported to OGC, left for only a few minutes, and then transported back before he saw anyone. *Resp.* at ¶ 27.  He indicates one of the officers who transported him there talked to "a lady there" and advised her that WCDC did not transport for counseling and that a mistake had been made. *Id.*  He indicates this "came from Nurse Bradley."  *Id.*

Jerrell asserts that he continued to make requests for treatment at OGC.  *Resp.* at ¶ 74. However, he states that he did not receive responses or copies of his requests back.  *Id.*

On February 11th, Jerrell indicated on a grievance that he had been told by the counselor at OGC that he would be put on anxiety and sleeping medications.  *Defts' Ex.* 3 at page 10; *Resp.* at ¶ 28.  In response, Nurse Bradley contacted OGC and was told there was no documentation indicating Jerrell had been placed on medication.  *Defts' Ex.* 3 at page 10.

Jerrell indicates he had been prescribed medications for anxiety or panic attacks prior to his incarceration at the WCDC.  *Resp.* at ¶ 75.  He states the prescriptions were by OGC,

AO72A
(Rev. 8/82)

Decision Point, and Dr. Horton.  *Id.*  However, he states it had been "quite a while" since he had

taken medication for these conditions.  *Id.*

Jerrell was asked how frequently he suffered these attacks, how often they occurred, and

what brought on the attacks.  *Resp.* at ¶ 76.  He indicated he had the attacks once or twice a week

and suffered shortness of breath, dizziness, weakness, and an overwhelming fear and

hopelessness.  *Id.*  With respect to what brought on the attacks, he replied:

> Thoughts, Nightmares of burning & demons.  Fear of dying from lack of medical
> care.  Wanting to die.  Not wanting to die.  Visions of girl trying to kill me &
> telling me to kill myself or she would kill me.  Not getting toilet paper.  Having
> to hold [bodily waste] for days and stressing about how people could be so cruel.
> Hop[e]lessness for mankind and myself.  Fear of being attacked by other inmates
> and being killed because of no help or interv[e]ntion.

*Resp.* at ¶ 76.

On February 14th, Jerrell requested a medical blanket because he had new skin grafts on

his hand and left side.  *Resp.* at ¶ 30.  He complained he was having trouble sleeping.  *Id.*  His

request for a blanket was denied because there was no medical reason for it and he did not have

a rash or hives.  *Id.*

On March 1st, Jerrell complained to Officer Reed that he had a toothache.  *Resp.* at ¶

31(A).  He showed Reed a tooth that had black in the middle and the gum around it was red and

slightly swollen.  *Id.*  Jerrell was given two Aleve for pain.  *Id.*  This was the same tooth he

complained about on December 7th.  *Id.* at ¶ 31(B).  Jerrell did not get to see a dentist the entire

time he was incarcerated at the WCDC.  *Id.*

Jerrell submitted a request asking for Aleve.  *Defts' Ex.* 3 at page 12.  He indicated

Officer Reed told him he needed to do that.  *Id.*  When Nurse Bradley saw Jerrell, she wrote that

he refused further over-the-counter medication because he had already gotten some Aleve. *Id.* She noted she would put Jerrell on the list to see the doctor and notify the ADC. *Id.* Jerrell states he did not refuse further over-the-counter medications and instead refused to pay Nurse Bradley for her visit. *Resp.* at ¶ 32.

On March 2nd, Jerrell stated he had been in the rubber room when he first got to the WCDC. *Resp.* at ¶ 33. He stated he had asked for pain pills and Nurse Bradley said if he asked again she would put him back in the suicide suit in the rubber room. *Id.* He indicated she also charged him for medication he didn't receive. *Id.*

In response, Jerrell was told that if he put in a request to see the doctor or nurse he would be charged. *Resp.* at ¶ 34. In addition if he was prescribed medication, he was told it would be offered to him and he had the option of refusing it. *Id.*

On March 3rd, Jerrell submitted a grievance stating he had not put in a medical request on March 1st but the nurse told him that he would be charged anyway. *Resp.* at ¶ 35. Jerrell stated he would pay for any medication he had signed for or medical requests he filled out but would not pay for others. *Id.* He asked that the money be returned. *Id.* In response, Jerrell was told that he had been taken to the sergeant's office and his account was explained to him. *Resp.* at ¶ 36. Jerrell was told that he had other visits and medication that he could be charged for. *Id.*

According to defendants' records, on March 3rd, Jerrell refused doctor's call. *Defts' Ex. 2* at page 4. Jerrell denies having refused doctor's call. *Resp.* at ¶ 37. He states the only time he said he didn't want to see Dr. Howard was in the nurse's station on May 7th. *Id.*

On March 23rd, Jerrell requested something for a migraine. *Resp.* at ¶ 38. Nurse Nestler authorized the officer to give him two Excedrin migraine. *Id.*

On April 13th, Jerrell submitted a grievance asking when he was going to be seen by the dentist. *Resp.* at ¶ 39. He stated he had been told four or five months ago he would be put on the list to see the dentist and that would probably take a month. *Id.*

Nurse Bradley responded to the grievance saying that Jerrell was on the list to see the dentist. *Resp.* at ¶ 40. She authorized Jerrell to have 600 mg. of Ibuprofen three times a day for thirty days. *Id.*

Jerrell was seen by Dr. Howard on April 14th for a bad toothache. *Resp.* at ¶ 41. He was prescribed Doxycycline and Ibuprofen and was to be seen by the dentist as soon as possible. *Id.*

On April 30th, Jerrell submitted a grievance stating his fiancé had put $20 on his books that day but the receipt said he only had $4.24. *Resp.* at ¶ 42. He stated this meant he had been charged another time to see the doctor about going to the dentist. *Id.* He stated it was not fair for him to get charged "over and over" and never getting to see the dentist. *Id.* He stated taking money off his books without a court order or his permission was the same as stealing. *Id.* Jerrell received no response to this grievance. *Id.* at ¶ 43.

On May 7th, Jerrell submitted a grievance complaining of a severe toothache. *Resp.* at ¶ 44. He said his wisdom tooth was broken off at the gum line. *Id.* He indicated he had been supposed to see a dentist for almost six months. *Id.* If he couldn't go to a dentist, he asked to go to the hospital to see a "real doctor." *Id.* He said he told them he had a bad wisdom tooth when he was first arrested. *Id.* In response, Jerrell was told he was on the next available appointment list. *Id.* at ¶ 45.

On May 7th, Jerrell was taken to the nurse's station to have his tooth examined due to complaints of pain. *Resp.* at ¶ 46. It was noted that his back lower wisdom tooth was broken,

-10-

the gum tissue around the tooth was red and swollen but no drainage was noted.  *Id.*  Jerrell

stated the problem still existed despite the antibiotics.  *Id.*  He was advised he needed to see Dr.

Howard again for continued antibiotics.   *Id.*  Jerrell became upset and said he wanted to see a

real doctor.  *Id.* at ¶ 47.  He stated this was a medical emergency and he wanted to go to the

hospital.  *Id.*  Nurse Goff advised Jerrell that Dr. Howard was a real doctor and that the tooth was

not a medical emergency.  *Id.* at ¶ 48.  Nurse Goff stated that Jerrell's life was not in immediate

danger.  *Id.*

Jerrell complained that for some reason he had been taken off the list to see the dentist

and had to see Dr. Howard to get back on.  *Resp.* at ¶ 49.  Nurse Goff informed Jerrell that he

was number one on the detainee list and that Dr. Howard did not have any control over Dr.

Beavers' office.  *Id.*  Jerrell was informed that if he went to the dentist in his current condition

Dr. Beavers would most likely give him antibiotics again until the swelling and infection went

down.  *Id.* at ¶ 50.  Jerrell was informed it would be futile to send him to the dentist now with

the condition of his tooth because Dr. Howard could continue antibiotics.  *Id.* at ¶ 51.

Jerrell stated that he did not want to see Nurse Bradley anymore because "she would

threaten me, call me a liar."  *Resp.* at ¶ 52.  Further, Jerrell states he refused to keep paying for

treatment that did not work.  *Id.*  He indicates that he was continuing to suffer.  *Id.*

Nurse Goff explained that people paid for doctor's visits and prescriptions multiple times

for the same problem.  *Resp.* at ¶ 53.  Nurse Goff advised Jerrell that he could refuse care.  *Id.*

at ¶ 54.  Jerrell replied that he was not refusing care if he was sent to the hospital.  *Id.*  Nurse

Goff replied that Jerrell would not be going to the hospital.  *Id.*  Deputy Sharp and Sgt. Morse

assisted Nurse Goff in explaining that Jerrell was not being refused medical care and that there

was a difference in the care that he needed and the care he wanted.  *Id.* at ¶ 55.  Jerrell asserts

that the care he was receiving was not what was needed.  *Id.*  He points out that even Dr. Howard

had said the tooth needed to be removed.  *Id.*

Jerrell stated he was not going to see Dr. Howard again.  *Resp.* at ¶ 56.  He was advised

that he would have to sign a form waiving the medical care he was being offered.  *Id.*  Jerrell

stated he would accept care but would file a grievance.  *Id.*

Jerrell prescription for Ibuprofen 200 mg., three tablets, three times daily as needed was

continued.  *Resp.* at ¶ 57.  He was scheduled to see Dr. Howard on May 12th.  *Id.*  He was also

told that he would remain number one on the dentist list.  *Id.*

On May 7th, Jerrell submitted a grievance complaining of a severe toothache.  *Resp.* at

¶ 58.  He stated his wisdom tooth was broken off below the gum line.  *Id.*  He stated his gum was

starting to grow over the broken tooth.  *Id.*  Jerrell stated he had been supposed to see the dentist

for almost six months.  *Id.*  If he couldn't see the dentist, he asked to go to the hospital.  *Id.*  He

again noted he had informed them of his bad wisdom tooth when he was booked in.  *Id.*

Jerrell submitted a request on May 7th asking for a special tray of food since he couldn't

chew any food.  *Resp.* at ¶ 59(A).  Jerrell states he had asked for the soft food diet when he was

booked in and "afterward."  *Id.*  When he asked Nurse Bradley, Jerrell states she threatened to

have him locked down if he kept complaining.  *Id.*  In response Jerrell was told his diet needed

to be approved through the nurse.  *Id.* at ¶ 59(B).  He was told his request would be forwarded.

*Id.*  According to Jerrell, he never received an answer from the nurse.  *Id.*

On May 11th, Jerrell submitted a medical request.  *Resp.* at ¶ 60.  He stated he was

scheduled to see the doctor to get back on antibiotics for his abscessed tooth.  *Id.*  He stated he

AO72A
(Rev. 8/82)

believed the infection had caused him "some kind of sickness." *Id.*  He stated he had a terrible headache and body ache for the last three days. *Id.*  For the last two nights, he said he had awakened to severe muscle spasms throughout his entire body. *Id.*  He stated he kept coughing up phlegm and his throat felt raw. *Id.*  Finally, he stated he was having panic and anxiety attacks. *Id.*

He submitted a request on May 11th asking if it was true he would not be charged for his medical because he was committed to the ADC. *Resp.* at ¶ 61.  Jerrell's request was forwarded to the nurse. *Id.*  Jerrell states he received no response from the nurse. *Id.*

On May 12th, Jerrell was seen by the doctor for muscle spasms, headaches, and tooth/gum problems. *Resp.* at ¶ 62.  He was prescribed Doxycycline and cough syrup. *Id.*  Defendants' records indicate Jerrell was diagnosed with an upper respiratory infection. *Defts' Ex.* 2 at page 11.

On May 13th, a request was sent to the ADC for approval of the extraction of the tooth, pain medication, cough syrup, panic and anxiety attacks associated with depression, and migraines. *Resp.* at ¶ 63.  On May 14th, ADC staff responded stating:  "dental need denied. Will eval. @ intake.  If with temp. refer to jail MD for eval of pg ? URI.  Panic/anxiety not emergent problems, will eval @ intake." *Id.* at ¶ 64.

On May 13th, Jerrell submitted a request asking if the ADC approved his medical care or not. *Resp.* at ¶ 65.  If it had, Jerrell asked if the money that had been taken off his books since he was committed would be returned. *Id.*  In response, he was given a copy of the fax from the ADC on May 14th that denied the request for dental treatment or treatment of his panic/anxiety problems. *Id.* at ¶ 66.

-13-

On May 17th, Jerrell submitted a grievance stating that the last time he had seen Nurse Bradley she had told him that he had to be put back on the doctor's list to see the doctor before he was put back on the dental list. *Resp.* at ¶ 67. He said he had been told the ADC finally approved him to see the dentist. *Id.* After he was put on antibiotics again and put on the list for the dentist, Jerrell stated the ADC denied his dental treatment. *Id.* Jerrell stated his wisdom tooth had been an ongoing problem since his incarceration and he was in severe pain. *Id.* If his problem wasn't going to be fixed, he asked that his money be returned. *Id.* The grievance indicates it was forwarded to the nurse. *Defs' Ex.* 3 at page 27. However, Jerrell states he received no response. *Resp.* at ¶ 68.

On May 25th, Jerrell submitted a grievance asking why for almost six months nothing had been done to fix his problem with his wisdom tooth. *Resp.* at ¶ 69. He stated he had to get to a dentist and had been in pain and was suffering since his incarceration in November. *Id.*

In response, Nurse Bradley stated the ADC had denied his request for dental care and said he would be evaluated at intake. *Resp.* at ¶ 70. Nurse Bradley also noted that Jerrell had been given a copy of the ADC's refusal. *Id.*

With respect to Nurse Bradley, Jerrell was asked about the threats she made against him. *Resp.* at ¶ 77. According to Jerrell, she threatened him on a number of occasions such as when he asked for pain medication for his face, when he asked to see a therapist or counselor, and when he asked about his tooth. *Id.* He states she threatened to lock him down, put him back in the "pickle suit," and lock him in a cold room. *Id.* Jerrell indicates she also threatened to take away any medical assistance he was getting. *Id.* He asserts she made it really "hard" on him by not giving him a medical blanket, a medical diet, or the treatment he needed. *Id.* Jerrell

-14-

indicates there were several days he couldn't eat anything because he couldn't chew.  *Id.*  He states he was in pain during his entire stay at the WCDC and intimidated by her and the fact that the Sheriff would allow this type of treatment of his inmates.  *Id.  See also Resp.* at ¶ 79.

Jerrell also alleges he was housed in a dangerous environment.  *Resp.* at ¶ 78.  He was asked to explain this allegation.  *Id.*  He asserts there are no panic buttons in the cells to notify the guards that you need help.  *Id.*  He indicates if there was an altercation between inmates help would not arrive until someone was seriously injured.  *Id.*  He asserts he was attacked verbally and injured medically.  *Id.*  He also states that other inmates were injured while he was at the WCDC.  *Id.*

In connection with Sheriff Helder, Jerrell contends Sheriff Helder failed to see to it that Jerrell got the medical care he needed or that his basic needs were met.  *Resp.* at ¶ 80.  Jerrell alleges:  he was not given a proper medical screening and/or follow-up care; he did not have toilet paper when he needed it; he was subjected to an unsafe environment; unqualified staff handed out medication; and the confidentiality of inmate records was not maintained.  *Id.*  Jerrell also states he was housed in a dirty cell with feces and blood on the door and walls when he was incarcerated with open burns.  *Id.* at page 50.  Since being transferred to the ADC, Jerrell maintains he has discovered he contracted Hepatitis C.  *Id.*  He believes the WCDC was where he contracted it.  *Id.*

On June 11th, Jerrell was transferred to the Diagnostic Unit of the ADC.  *Resp.* at ¶ 72.  Defendants' Exhibit 6, Jerrell's inmate balance history report, accurately reflects all the charges made to his account for nurse's visits, doctor's visits, over the counter medication, and prescriptions.  *Id.* at ¶ 71.

-15-

## II.  Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a . . . verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."  Id. (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## III.  Discussion

Defendants have now moved for summary judgment.  First, defendants argue that the case must be construed to be against them in their official capacities only because plaintiff did not indicate in the complaint that he was asserting individual capacity claims against them.   As there is no proof of an unconstitutional custom or policy, defendants maintain they are entitled to judgment as a matter of law.   Second, defendants argue that plaintiff was not denied adequate medical care.  With respect to the first period of incarceration, they state Jerrell has no proof he

-16-

was incarcerated at the WCDC at that time.  With respect to the second period of incarceration, defendants maintain that plaintiff saw the jail medical personnel on numerous occasions, was provided with medication, and received all medical treatment and/or medication ordered. Moreover, they argue a detainee may constitutionally be made to pay the cost, or some portion of the cost, of medical care furnished to him.  Third, defendants maintain that Jerrell's claims regarding unanswered grievances do not state a claim of constitutional dimension.   Finally, defendants maintain that verbal threats and name calling do not amount to a constitutional violation.

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendants acted under color of state law and that they violated a right secured by the Constitution.  *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).   The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983.  *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

**(A).** *Official Capacity and Individual Capacity Claims*

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or in both.  In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits.  As explained by the *Gorman* case:

-17-

Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. Id. 502 U.S. at 24-27, 112 S. Ct. at 361-62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. Id. 502 U.S. at 25-27, 112 S. Ct. at 362.

*Gorman*, 152 F.3d at 914.

The Eighth Circuit has consistently advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989); *see also Andrus v. Arkansas*, 197 F.3d 953 (8th Cir. 1999)(In actions against officers, specific pleading of individual capacity is required to put public officials on notice they will be exposed to personal liability). When the plaintiff fails to state whether he is suing an official in his individual capacity, the Eighth Circuit has construed the claim to be against the official in his official capacity only. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999)("[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity"); *Egerdahl v. Hibbing Comm. Coll.*, 72 F.3d 615, 620 (8th Cir. 1995)("*Nix* requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in their personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient").

-18-

In his response to the summary judgment motion, plaintiff indicates he was unaware of the distinctions between individual and official capacities claims. *See Resp.* at ¶ 81(A). A distinction at times difficult for even those with legal training to make. *See e.g., Vanhorn v. Oelschlager*, 502 F.3d 775, 779 (8th Cir. 2007)(state officials misconstrued the distinctions between official and individual capacity claims and the immunities available). Given the duty of the court to liberally construe *pro se* pleadings, the plaintiff's statement in his summary judgment response, and the fact that it does not appear defendants will be unfairly prejudiced in anyway, we will construe the complaint as asserting individual capacity claims against the defendants.

**(B).** *Denial of Adequate Medical Care Claim*

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard. *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006). To prevail on an Eighth Amendment claim, plaintiff must prove that defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal

-19-

recklessness, which demands more than negligent misconduct." *Popoalii v. Correctional Med. Servs*, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

### (1). *The First Incarceration 9/5/08 to 9/7/08*

Defendants suggest plaintiff was incarcerated in either Berryville, Arkansas, or in Cassville, Missouri, for several days prior to his arrival at St. John's for treatment of his burns. This statement appears to be based on a remark contained in the St. John's medical records. Defendants maintain plaintiff must come forward with some evidence that he was in their custody immediately following the methamphetamine lab explosion. *See Defts' Brief* (Doc. 19) at page 9. However, plaintiff clearly alleged he was incarcerated in the WCDC on these dates. *See e.g., Complaint* (Doc. 1) at page 4. Moreover, he has sworn under penalty of perjury that he was incarcerated there from September 5th to September 7th. *See e.g., Resp.* at ¶ 73 and page 51. And, nothing has been presented to the court that disputes plaintiff's allegations.

Plaintiff was treated at WRMC the same day he became incarcerated. It is obvious from these records that plaintiff was in need of medical care including dressing changes, the application of a prescribed cream to the burns. At a minimum, there was some amount of pain associated with the burns. Plaintiff maintains the prescriptions he was given were not filled and he only received one pill during this incarceration. He further asserts that he was released on his own recognizance on September 7th so he would be responsible for seeking his own medical care. He indicates he was not taken to the hospital but instead was dropped off at an apartment. Clearly, there are genuine issues of fact as to whether defendants exhibited deliberate indifference to plaintiff's serious medical needs during this incarceration.

-20-

**(2).** *The Second Incarceration 11/17/08 to 6/11/09*

Defendants maintain that Jerrell's claims with respect to the treatment of his burns amounts merely to a difference of opinion as to his course of treatment or the decision of whether any treatment was needed. As defendants accurately point out, medical personnel are given "considerable latitude . . . in the diagnosis and treatment of medical problems of inmates." *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979). It is well settled that a "prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010)(internal quotation marks and citation omitted). An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." <u>Id</u>. Despite this, issues of fact exist when there is a question of whether or not medical staff exercised independent medical judgment and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference. *See Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990).

In this case, Jerrell maintains the defendants exhibited deliberate indifference to his serious medical needs by: refusing him a medical blanket he requested because of his skin grafts; failing to provide him with adequate dental care; and failing to provide him with necessary psychiatric care. With respect to the burns, the plaintiff submitted a request for a medical blanket on because of his new skin grafts. *Defts' Ex.* 2 at page 7. Jerrell stated that the blanket was "really" poking and aggravating the skin graft sites. *Id.* This request was denied by Nurse Bradley. *Id.* She wrote there was zero medical reason to allow the blanket and wrote no rash or hives. *Id.* There is nothing in her comments about the skin grafts. *Id.* Nothing before

-21-

the court indicates she considered authorizing a medical blanket to him because of his skin grafts.

With respect to his dental condition, Jerrell points out that when he was booked in he stated he had a sore tooth. *Defts' Ex.* 2. at page 2. Jerrell continued to seek dental care during his entire incarceration at the WCDC and submitted a number of medical requests and grievances on the subject. *See Defts' Ex.* 2.

"Dental conditions, like other medical conditions, may be of varying severity." *Chance v. Armstrong*, 143 F.3d 698, 702 (2nd Cir. 1998). In this case, on December 7th, Jerrell submitted a request for treatment because of a broken off wisdom tooth. *Defts' Ex.* 2 at page 3. He was seen by the doctor on December 9th. *Defts' Ex.* 2 at page 4. The doctor noted the tooth needed to be pulled and states "see dentist as possible." *Id.* There is nothing in the record that indicates Jerrell was placed on a list to see the dentist or that an appointment was made for him following this visit. Jerrell was seen by the doctor on April 14th and he noted the tooth was bad and Jerrell should "see dentist as possible." *Defts' Ex.* 2 at page 5. The doctor again noted Jerrell had problems with his tooth and gums on May 12th. *Id.* at page 11.

The first indication that any effort was made to provide dental treatment is a request for approval by the ADC of treatment for, among other things, a wisdom tooth that needed to be pulled. *Defts' Ex.* 2 at page 12. The request is dated May 13th and indicates Jerrell was placed on the ADC waiting list on January 14th. *Id.* The ADC denied the request for dental treatment on May 14th. *Id.* at page 13. No further efforts were made to provide Jerrell with dental treatment.

Under the Eighth Amendment's proscription against cruel and unusual punishments,' prison officials are obligated to provide "inmates in their custody with medical care." *Plemmons*

*v. Roberts*, 439 F.3d 818, 823 (8th Cir. 2006).  Here, Jerrell had dental needs when he was booked in and made written requests for dental care beginning on December 7th.  Despite the doctor's recognition of the need for dental care on December 9th, so far as the record shows, no steps were taken to provide the needed care.  Defendants may not avoid the provision of medical or dental care to inmates in their custody merely because the inmate is awaiting transfer to a different facility.  The duty to provide medical care is one arising out of the Eighth Amendment of the United States Constitution.  Regardless, of the terms of the defendants' contract with the ADC, if an inmate in defendants' custody needs care it must be provided.  *See e.g., Toombs v. Bell*, 915 F.2d 345 (8th Cir. 1990)("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical care to those in its custody.")(citation and internal quotation marks omitted).

In this case, Jerrell continued over a period of seven months to submit medical requests and grievances regarding his broken tooth and/or toothaches.  We believe there is a genuine issue of material fact as to whether Nurse Bradley knew of, yet deliberately disregarded, Jerrell's serious dental needs.  *See e.g., Moore v. Jackson*, 123 F.3d 1082, 1084-87 (8th Cir. 1997)(issue of fact existed whether inmate repeatedly reported severe tooth pain in medical service requests and grievances but care was delayed from April to December); *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995)(three-week delay in dental care, coupled with knowledge that inmate was suffering, can support Eighth Amendment violation); *Patterson v. Pearson*, 19 F.3d 439, 440 (8th Cir. 1994)(summary judgment reversed where there was evidence that dentist learned of inmate's tooth-related swelling, headache, and severe pain on March 19, but did not remove tooth until April 15).

We also believe there is a genuine issue of fact as to whether the policy of the WCDC was to delay or deny medical care to ADC committed inmates.  While supervisors cannot be held liable on a theory of *respondeat superior*, they may be held liable if they knew the prisoner's "serious medical needs were not being adequately treated yet remain indifferent." *Langford v. Norris*, No. 09-1862, 2010 WL 2813551, *10 (8th Cir. July 20, 2010)(citation omitted).  I believe there are issues of fact as to whether the County's policies, or lack thereof, caused, or contributed to, the alleged inadequacies and delay in the provision of medical care.  County policy, in regard to the care and custody of detainees, is, of course, established by the Sheriff.  Ark. Code Ann. § 12-41-502 (Supp. 2010)("The county sheriff of each county in this state shall have the custody, rule, and charge of the jail within his or her county and all prisoners committed in his or her county, and he or she may appoint a jailer for whose conduct he or she shall be responsible.").

"This duty to provide medical care encompasses detainees' psychiatric needs." *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002)(citations omitted); *see also Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir.1995)("Prison staff violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious mental-health-care needs").  Obviously, a psychiatric or mental  condition can constitute a serious medical need and pose a risk of serious harm.  *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000).

Here, the only record evidence about Jerrell's need for psychiatric care is in the records of the OGC which indicated he was in need of a follow-up appointment because of current depression.  *Defts' Ex.* 5.  The OGC records indicate the follow-up appointment was cancelled because defendants declined to transport him to the OGC for counseling.  *Defts' Ex.* 5.  While defendants maintain Jerrell was transported to the OGC for the follow-up appointment, *Defts'*

-24-

*Ex.* 2 at page 6, Jerrell states that he was taken there and then transported back to the WCDC without seeing anyone.  This assertion is supported by the fact that the OGC records do not indicate any follow-up visit occurred.  *Defts' Ex.* 5.  Defendants also rely on the fact that the ADC denied their request for approval for treatment for anxiety and panic attacks.  *Defts' Ex.* 2 at page 13.

As discussed above, defendants may not avoid their constitutional duty to provide Jerrell with medical care by changing his status to ADC committed.  Nothing in the record establishes that Jerrell was provided any medication, counseling, or any other type of care for his psychiatric needs or that a determination was made he did not need such intervention.  Clearly, there are genuine issues of material fact as to whether defendants exhibited deliberate indifference to Jerrell's psychiatric needs.

### (3). *Deductions for Visits to Medical Staff*

Finally, Jerrell object to a number of charges for nurses or doctors visits.  He contends he was charged a number of times for visits when he was seeking treatment for his tooth.  As he never received treatment for it and was not taken to a dentist, he doesn't believe he should have been charged for these visits.

While the Eighth Amendment's prohibition against cruel and unusual punishment requires jails to provide basic medical care to inmates, there is no requirement that the jails provide the medical care free of cost.  *See e.g., Reynolds v. Wagner*, 128 F.3d 166, 173-74 (3rd Cir. 1997)(deliberate-indifference standard does not guarantee prisoners right to be entirely free from cost considerations that figure in medical-care decisions made by most non-prisoners in society).  Inmates may be constitutionally required to pay for their own medical expenses, if they can afford to do so.  *Roberson v. Bradshaw*, 198 F.3d 645 (8th Cir. 1999).  *See also Moore v.*

-25-

*Plaster*, 266 F.3d 928, 933 (8th Cir. 2001)(Prison inmate may file replevin action in state court to recover money taken from his prison account);  *Jensen v. Klecker*, 648 F.2d 1179, 1183 (8th Cir. 1981)(no basis for due process claim where deductions from prisoner accounts were assessments for value received).  Here, Jerrell was seen by the nurse or doctor each time a deduction was made.  No claim of constitutional dimension is stated by the deductions from his account.

### (C).  *Conditions of Confinement*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)(citation omitted).  The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment.  U.S. Const. amend. VIII.  *See also Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006)(deliberate indifference standard of the Eighth Amendment applies to all claims that prison officials failed to provide adequate food, clothing, shelter, etc.).  The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime."  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element.  *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's

-26-

necessities.  The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted).  Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Id.*  The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

Jerrell maintains he was left without access to toilet paper for days at a time causing him physical distress. *Resp.* at ¶ 17.  He also maintains he feared for his safety while incarcerated. *Id.* at ¶ 78.  He indicates other inmates were attacked as a result of the lack of safety measures. *Id.*  Defendants have not addressed these claims.  Given Jerrell's allegations, I believe there are questions of fact as to whether Jerrell was housed under unconstitutional conditions of confinement.

**(D).** *Inadequate Grievance Procedure*

With respect to plaintiff's claims that the grievance procedure was inadequate, I agree with defendants that merely not receiving responses to grievances or receiving responses believed to be inadequate does not state a separate claim of constitutional dimension.  In general, "[i]nmates do not have a constitutionally protected right to a grievance procedure.  Because a . . . grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the . . .  grievance procedure is not actionable under § 1983." *Ashann-Ra v. Commonwealth of Virginia*, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000)(citations omitted); *see also Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)(inmates have no constitutional right to grievance procedure); *Blagman v. White*, 112 F. Supp. 2d 534 (E.D. Va. 2000)(inmate

-27-

has no constitutional entitlement to grievance procedure), *aff'd*, 3 Fed. Appx. 23 (4th Cir. 2001).

However, in this case the plaintiff maintains he was being denied adequate medical care and that his grievances regarding the inadequate medical treatment were ignored or responded to by the medical personnel he was complaining about. Plaintiff may use the existence of grievances and the responses, or lack of responses, to establish deliberate indifference to serious medical needs on the part of the defendants. As mentioned above, defendants may be held liable if they knew the prisoner's "serious medical needs were not being adequately treated yet remain indifferent." *Langford v. Norris*, No. 09-1862, 2010 WL 2813551, *10 (8th Cir. July 20, 2010)(citation omitted). I believe there are issues of fact as to whether the County's policies, or lack thereof, caused, or contributed to, the alleged inadequacies and delay in the provision of medical care.

**(E).  *Verbal Threats by Nurse Bradley***

"Verbal threats do not constitute a constitutional violation." *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985). Similarly, taunts, name calling, and the use of offensive language do not state a claim of constitutional dimension. *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993)(inmate's claims of general harassment and of verbal harassment were not actionable under § 1983); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987)(verbal threats and abuse by jail officials did not rise to the level of a constitutional violation); *Martin*, 780 F.2d at 1338-1339 (being called an obscene name and threatened with adverse consequences unless he cut his hair and shaved does not state a claim of constitutional dimension); *Black Spotted Horse v. Else*, 767 F.2d 516, 517 (8th Cir. 1985)(use of racially offensive language in dealing with a prisoner does not, by itself, state a claim). *Cf. Burton v. Livingston*, 791 F.2d 97, 100-101 (8th Cir. 1986)(A claim was stated where the prisoner alleged "that a prison guard, without provocation, and for

-28-

the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death.").

No claim of constitutional dimension exists with respect to the alleged verbal threats made by Nurse Bradley. However, evidence regarding the threats may be used to establish she was deliberately indifferent to Jerrell's serious medical needs.

### Conclusion

For the reasons stated, defendants' motion for summary judgment (Doc. 18) will be granted in part and denied in part. Specifically, the motion will be granted with respect to plaintiff's claim regarding the deductions from his inmate account, the inadequate grievance procedure, and the verbal threats made by Nurse Bradley. In all other respects, the motion will be denied.

However, plaintiff will be allowed to argue that the manner in which the grievances regarding his medical care were handled establishes deliberate indifference to his serious medical needs on the part of the defendants. Additionally, he will be allowed to present evidence regarding Nurse Bradley's threats in an effort to establish deliberate indifference on her part. A separate order will be entered this same day.

**DATED** this **10th day of September 2010.**

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)