IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

TOMMY LOUIS JERRELL                                                          PLAINTIFF

            v.                              Civil No. 09-5060

NURSE RHONDA BRADLEY;
and SHERIFF TIM HELDER                                                      DEFENDANTS

**<u>MEMORANDUM OPINION</u>**

Plaintiff, Tommy Louis Jerrell (hereinafter Jerrell), filed this action pursuant to 42 U.S.C. 1983. He proceeds *pro se* and *in forma pauperis*. This case is before me for decision pursuant to the consent of the parties (Doc. 11).

Jerrell contends he was denied adequate medical and dental care while he was incarcerated at the Washington County Detention Center (WCDC). He also contends he was refused transport to therapy sessions. On April 26, 2011, a bench trial was held. At the conclusion of the trial, the case was taken under advisement pending preparation of this memorandum opinion.

**1. Evidence Presented**

This case involves two separate time periods during which Jerrell was incarcerated at the WCDC. During the first period, Jerrell was incarcerated from September 5, 2008, until September 7, 2008. During the second period, he was incarcerated from November 17, 2008, until June 11, 2009. Until January 14, 2009, Jerrell was a pretrial detainee.

At the hearing, the testimony of the following witnesses was heard: (1) Bobbie Vanlaningham; (2) Tommy Jerrell, the Plaintiff; (3) Nurse Rhonda Bradley, a named Defendant; (4) Cody Caudle; (5) Randall Denzer; (6) Sheriff Tim Helder, a named Defendant; (7) Wesley Watkins;

-1-

and (8) Leslie Reese.  For purposes of discussion, the testimony of the witnesses will be summarized.

**Bobbie Vanlaningham**

Jerrell is Vanlaningham's brother.  In September of 2008, she testified Jerrell suffered severe burns to his hands and stomach.  When he was released from the WCDC on September 7th, she testified Jerrell's burns were grossly infected and his pain level was "horrendous."  He had a shirt on loosely around his shoulders.  She testified she could not recall whether he had pants on.

She first took Jerrell by her home, looked at the wounds, put gauze on them, and then took him to the Berryville hospital.  Personnel there suggested he should be taken to the Burn Center in Springfield.  Vanlaningham took Jerrell to Springfield, Missouri, to be treated at the burn unit of St. John's Regional Health Center.  He was admitted and remained hospitalized for four days.

During his second incarceration in the WCDC, Vanlaningham testified that Jerrell indicated numerous times that he was in pain from a bad tooth and was being denied treatment.  She also that Jerrell had some "mental problems" and had suicidal tendencies.  Prior to his incarceration, Vanlaningham indicated Jerrell had been in therapy.  She testified she had attempted, through Jerrell's attorney, to have him continue with his therapy.

**Tommy Jerrell**

On September 5, 2008, Jerrell testified he suffered severe chemical burns and was seen at the emergency room at Washington Regional Medical Center.  While there, Jerrell indicated his burns were treated and he was  given morphine for the pain.  Jerrell testified he only recalls a portion of the things that happened on September 5th.

Accordingly to Jerrell, he has no recollection of being released from the hospital on September 5th.  However, he indicates he was in severe pain and kept asking for help.

-2-

When he was booked into the WCDC later that day, Jerrell was in a hospital gown and had no medication with him. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 2. Jerrell was placed in a cell by himself. He maintains the cell was dirty and had blood and feces on the wall. He was dressed only in a suicide smock. Jerrell maintains he kept asking for help, was in severe pain, and his burns became infected because of the cell's dirty conditions.

After a period of time, he was moved to a rubber room. During his incarceration from September 5th to the 7th, Jerrell testified he only received a single pill and he could not recall if it was an antibiotic or Ibuprofen. Jerrell states that the hospital had given him prescriptions for both an antibiotic and Perocet, a pain medication. When he was released, Jerrell was told he was being released on his own recognizance so that he could seek medical attention. Upon release, Jerrell testified he was given a bag containing an antibiotic and pain medication.

That day, Jerrell was seen at St. John's Hospital in Berryville, Arkansas. *Plaintiff's Exhibit* (hereinafter *Plff's Ex.*) 3. A notation was made that his hand was dressed but that it hadn't been debrided. *Id.* at pg. 3. He was given pain medication and antibiotics; his burns were debrided; an antibiotic ointment applied, and redressed. *Id.* at pgs. 2-4. He was referred to the burn center in Springfield, Missouri. *Id.*

When he arrived at St. John's Regional Health Center, Jerrell testified he was in severe pain and distress. It was noted that the infection was evident and there was a large amount of pus like drainage. *Plff's Ex.* 4 at pg. 6. Jerrell's burns were excised and grafting was done. *Id.* at pg. 1. Jerrell testified that the scarring was worse than it would have been had he received proper treatment at the WCDC. He did not believe Nurse Bradley had any involvement in his care or treatment in September of 2008. Jerrell maintains Sheriff Helder is responsible because he runs the jail and

-3-

makes the ultimate decisions.

On November 17, 2008, Jerrell was booked back into the WCDC.  The only medical screening done at intake is the inmate medical questionnaire.  *Defts' Ex.* 10.  When he was booked in, Jerrell states he was crying, severely distressed, and anxious.   He testified he was "pretty close" to taking his own life.  He indicated that the other inmates kept him from attempting suicide.

 At the time of booking, Jerrell indicates he was under a court order to see a counselor and had four more appointments.  He was not prescribed any medication.  Jerrell testified he was suicidal at the time and needed to continue his therapy.  He testified he was transported a single time to Ozark Guidance Center.  After waiting ten to fifteen minutes, they were told the appointment had been cancelled by the WCDC.  Jerrell testified that Bradley had said the WCDC did not transport for counseling.  He asserts his requests for continued therapy were denied.

Jerrell indicates there was no follow-up on the intake medical questionnaire.  Jerrell did, however, speak with Nurse Bradley several times about his various conditions.  In response, he maintains she threatened to put him on lock down.  She did, however, inform him that he was on the list to see the dentist as soon as possible.

On December 7th, Jerrell submitted a medical request indicating he had a broken wisdom tooth and was in pain.  *Defts' Ex.* 12.  In response, he was placed on the list to see the doctor and given Ibuprofen on an as needed basis.  *Id.*  In total, Jerrell believed that during his incarceration he submitted twenty or thirty requests or grievances about his tooth.

Jerrell was seen by Dr. Howard on December 9th.  *Defts' Ex.* 32.  Dr. Howard indicated the tooth needed pulling and wrote "see dentist as possible."  *Id.*  Jerrell was prescribed antibiotics for ten days. Although Jerrell testified Nurse Bradley told him that he was next on the list to see the

-4-

dentist, he was never seen during his incarceration at WCDC.  In fact, he testified that Nurse Bradley told him he was on the dentist list several times.  Once he got to the ADC, Jerrell stated his tooth was pulled within a week.  The tooth was still infected and he was put on antibiotics and a pain reliever.

**Nurse Rhonda Bradley**

Bradley testified she is a licensed practical nurse (LPN) and has worked at the WCDC for nine years.  According to Bradley, if an inmate indicates on the medical questionnaire completed at booking that he had medical issues, he would be evaluated by medical personnel.  She testified the nurses screen the questionnaires to determine if the inmate needs to be seen.  If a need for psychiatric care is indicated, Bradley testified the inmate's psychiatrist would be contacted and it would be determined what medication, if any, the inmate was on.  When medications are distributed, the inmate initials the medication log.  If there are no initials, the inmate did not get the medication.

With respect to the September 2008 incarceration, Bradley testified there should have been some follow-up on Jerrell because of the burns, the fact he was wearing a hospital gown when booked, and the medical issues he identified.  However, there was no medical documentation establishing any follow-up was done.  Bradley did not know who reviewed his questionnaire.

With respect to the November 17th booking, Bradley testified there should have been follow-up because Jerrell listed yes in answer to several questions and noted several problems he was having.  *Defts' Ex.* 10.  Bradley testified there was no nursing note indicating Jerrell had been seen by jail medical staff and no follow-up.  According to Bradley, Jerrell should have been seen either that night or the following morning.  Bradley could not recall if she was on duty when Jerrell was booked in.  She indicated medical staff work seven days a week.

When she received the December 7th medical request, Bradley testified this was the first time

she was aware Jerrell was having problems with a tooth.  She responded to the medical request, looked at his tooth which was abscessed, prescribed him Ibuprofen, and put him on the list to see the doctor.

Jerrell also talked to her about undergoing therapy at the OGC.  Bradley called the OGC.  She spoke with the doctors' receptionist and was told Jerrell had last been seen on October 31, 2008, and had not been on medication since 2002.

After the doctor said on December 9th, that Jerrell should see the dentist, Jerrell's name was placed on the "dental list."  The list is handwritten and kept in a spiral notebook.  *See Defts' Ex.* 41. Jerrell's name was written on the list on December 9th.  *Id.*

According to Bradley, it is difficult to get dentists to see prisoners.  As a result, she testified that they work with a single dentist, Dr. Beavers from Lincoln, Arkansas.  The WCDC was using Dr. Beavers when Bradley first started working at the WCDC.  Individual appointments are not made for the  prisoners.  Instead, Dr. Beavers' office would say that they could see a certain number of prisoners on a given date at a given time.  For example, three prisoners at 1:00 p.m. on January 16th.

The list would be consulted and the next three inmates would be taken.  On January 16th, Jerrell's name came up but he was in court.  *Defts' Ex.* 41.  He was therefore skipped and the appointment was given to Damien Domnick, the next inmate on the list.  *Id.*

The date to the left of the inmate's name is the date he is placed on the list.  *Defts' Ex.* 41. "ADC APP" means the ADC has approved the dental visit and will pay for it.  Just the notation ADC simply means the inmate has been sentenced to the ADC.  "ADC denied" means the ADC denied the request for dental treatment.  A date written after the inmate's name is the date Dr. Beavers did dental work on the inmate.

The next time Dr. Beavers saw inmates was on February 4, 2009.  The page of the notebook containing Jerrell's name was turned without him being sent to the dentist.  Bradley testified the only explanation was that someone thought the list on that page was finished and the appointments were given to inmates on the next page.

Dr. Beavers saw inmates on February 4th, February 11th, February 18th, February 20th, and February 25th.  Again, Nurse Bradley testified she could only assume someone believed the page containing Jerrell's name had been completed.  She also asserted that if Jerrell had been sent to the dentist with an abscessed tooth, he would not be worked on.  Instead, he would be prescribed antibiotics.

When it was discovered Jerrell had been missed, he was placed back on the list in the margin not in the column.  On March 27th, Jerrell was put back in the list.  His name appeared in the margin with a notation that ADC had denied his request for dental treatment.  From March 27th to May 21st, because of personal family issues, Dr. Beavers did not see any inmate patients.  No steps were taken to locate another dentist during this time frame.

According to Bradley, the policy, under a different captain, Captain Osborne, was that if the inmate was ADC property and they denied a request for dental care, we did not send the inmate to the dentist.  This policy has been changed and an inmate in need of dental care is taken regardless of an ADC denial.

When Jerrell's name came up again on the dentist list, Bradley testified they had received ADC's denial of outside dental treatment.  *Defts' Ex.* 31.  In response to Jerrell's grievance regarding his dental problem, Bradley wrote that the ADC had denied his request for dental treatment and he would be evaluated at intake.  *Plff's Ex.* 7 page marked 92 of 96.  Since Jerrell had been sentenced

and was "ADC's property," Bradley testified the WCDC needed approval for the treatment. However, Bradley testified it was not their practice to delay care while an inmate was awaiting transfer to another facility. Bradley testified Jerrell did not get dental treatment in a timely manner. Bradley testified that severe pain can constitute an emergency.

On February 3rd, Jerrell was transported to the OGC for a follow-up appointment. *Defts' Ex.* 30. Jerrell had been transported to OGC one other time for a court ordered forensic evaluation. Bradley testified she completed the medical transport sheet for the February 3rd transport noting on the bottom: "No Narcotics or Benzodizipines–ADC Property." Despite this, if the a narcotic or Benzodizipine medication had been prescribed, Bradley testified the medication would have been obtained for the inmate.

Bradley denied that she ever told Jerrell or anyone at OGC that the WCDC did not transport inmates for counseling. Further, she testified there is no policy that prohibited transportation of inmates for counseling purposes.

Bradley testified that medical staff usually respond to any grievances about medical issues. She indicated that this is done because other jail personnel do not have the knowledge to response to medical issues.

**<u>Cody Caudle</u>**

In September of 2008, Caudle testified he worked at the WCDC. Caudle was the intake officer on September 5, 2008. He recalled Jerrell because of the burns he had and the fact he was in a hospital gown. *Defts' Ex.* 2. The intake sheet states Jerrell had no medication with him, was taking no medication, and had no medical complaints/injuries. *Id.* Caudle testified it was incorrect to indicate Jerrell had no medical issues.

-8-

When an inmate being booked in is injured, the nurse usually comes and assesses the situation. If the injuries are too serious, the inmate will be refused. When an inmate is refused, the arresting agency is responsible for caring for him. Once the inmate had been treated and released, the arresting agency may bring the inmate back to be booked in.

In Jerrell's case, the officer who brought Jerrell mentioned that he had been at Washington Regional prior to being arrested. No one represented that Jerrell had been treated and released.

When someone comes in with suicidal tendencies, he is put in a smock and left to sit on the chairs in the booking area where he can easily be observed until booking is complete. The inmate would then be placed in a padded cell on a fifteen minute watch. According to Caudle, there was no blood or feces in the padded cell. He testified the cell had been cleaned twice that day. Prior to a new inmate being placed in the cell, Caudle testified it was bleached and mopped.

In November, when Jerrell was booked in again, Caudle testified he remembered Jerrell from the September incarceration because of the burns. The burns were significant enough to result in Caudle recalling them to this day.

**Major Randall Denzer**

Denzer testified he is in command of the jail and is familiar with the policies and practices of the WCDC. Denzer had no personal knowledge regarding Jerrell's September 2008 incarceration. However, because of Jerrell's injuries, Denzer stated the booking sergeant would have been trying to get Jerrell out of jail on a signature bond. Jerrell should have been seen by one of the nurses and it be documented. There is no documentation regarding a medical evaluation or of dressing changes. According to Denzer, the decision to seek the release of an inmate due to his medical condition does not affect the treatment the inmate receives. On Sunday morning, Jerrell was released on his own

recognizance.

The intake officer has the right to call a nurse or refuse an inmate.  The booking officer completes the medical questionnaire and fingerprinting.  When there is reason to believe an inmate may make a suicide attempt, the inmate is put in the padded cell or, if it is full, is placed in a booking cell.  Fifteen minute checks are done.

According to Denzer, the WCDC does not have any policy or practice of not providing medical care.  He testified he was not aware of any policy providing that the detention center would not provide dental care after an inmate was ADC committed.

With respect to dental care, Denzer said he had learned that Captain Osborne took the position that the WCDC would not pay for dental care for ADC committed inmates.  If an inmate was denied dental care by the ADC, he did not get dental care unless ADC paid for it.  According to Denzer, he and Sheriff Helder were unaware of the decision made by Osborne.  Osborne was captain of the jail and Denzer was Osborne's supervisor.  Osborne resigned and the policy was changed by Captain Livermore.

Until this lawsuit was filed, Denzer testified he had never seen the dental notebook.  Denzer agreed Osborne's decision was not right and ADC committed inmates should have been allowed to go to the dentist.  The ADC does ask the WCDC to keep it informed of any medical condition.  A form is submitted indicating what type of care is needed.  ADC approval of the suggested treatment also means the ADC will pay for it.  Denzer testified they wanted ADC to pay the costs of medical and dental care.  However, he agreed the facility had a responsibility to provide care without regard to who paid for the care.  Denzer agreed that seven months was too long to wait to see a dentist.

-10-

With respect to transportation for counseling, Denzer testified there was no policy or practice of refusing to provide transportation for counseling. In fact, he indicated transport officers went to the OGC with inmates on almost an every day basis. Denzer denied that Jerrell was ever denied transportation to the OGC.

Denzer indicated the cells are cleaned twice a day--morning and afternoon. The inmates clean with the trustees' help. The cells are inspected after the cleaning is done. Additionally, he testified the jailers do hourly checks of the cells.

**<u>Sheriff Tim Helder</u>**

Helder had no interaction with Jerrell and in fact didn't know he had been incarcerated at the WCDC twice until this lawsuit was filed. Helder testified he had no knowledge about Jerrell's medical condition, did not know the WCDC policies were not being followed, and had no knowledge regarding Jerrell's requests for, or need for, dental care.

If a detainee has a noticeable condition at intake and the determination is made that the detainee would need more treatment than we could render, Helder testified they either take the detainee outside the facility to be treated or try as hard as we can to get the detainee out of jail. This determination would have been based on either the recommendation of a nurse or Dr. Howard.

According to Helder, it has always been the policy of the WCDC to provide treatment to detainees. Helder denied there was any policy prohibiting the transport of detainees to OGC for counseling.

He agreed there is an effort to work with the ADC and hopefully the ADC will pay for the treatment. Requests for approval of treatment are sent to the ADC as soon as possible. If the detainee has a serious enough situation, Helder testified they would work the ADC to have the

detainee transferred as quickly as possible.

Helder testified that Osborne had no authority to set policy.  Until this lawsuit was filed, Helder stated he had not heard that Osborne's practice was not to pay for dental care after an inmate was ADC committed.

Helder testified he was not involved in the day to day running of the jail.  Instead, he stated he hired competent people to be in charge of the day to day aspects of running the jail.  He indicated that decisions had to be made at lower levels or nothing would get done.  He also stated he put in place an internal process to evaluate detainee complaints.  To his knowledge, there had been no complaints about Nurse Bradley.

With respect to Jerrell's particular case, Helder testified it was his opinion that Jerrell should have received dental treatment.  Helder stated the failure to treat Jerrell went against the WCDC policy.

### Deputy Wesley Watkins

Watkins testified he was a transport deputy in February of 2009 at the WCDC.  Watkins did not personally recall Jerrell.  According to Watkins, the transportation log indicates that he and Deputy Reese transported Jerrell to OGC.

Watkins could not recall transporting Jerrell to OGC when he was not seen.  Watkins indicated that inmates are transported to OGC two to three times per week.  Watkins has never told any inmate that the WCDC did not transport inmates for counseling.

### Deputy Reese

Reese testified that he also reviewed the transport records that indicated he and Watkins transported Jerrell to the OGC.  Reese stated he had no made the statement that the WCDC would

not transport inmates for counseling.

**2.  Discussion**

The Eighth Amendment imposes duties on detention center officials to ensure prisoners receive adequate medical and dental care.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  The Due Process Clause of the Fourteenth Amendment imposes analogous duties on detention center personnel with respect to pretrial detainees.  *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).  "This makes little difference as a practical matter, though:  Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment."  *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007).  *See also Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007)(deliberate indifference standard applies to pretrial detainees denial of medical care claim).

"An official who is deliberately indifferent to a prisoner's medical needs is subject to suit under § 1983."  *McRaven v. Sanders*, 577 F.3d 974, 979 (8th Cir. 2009).  The deliberate indifference standard "has both an objective and subjective component."  *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009).   The standard requires a Plaintiff to show:  (1) the deprivation alleged is objectively serious; and (2) the official knew of and then disregarded an excessive risk to the plaintiff's health or safety.  *Farmer*, 511 U.S. at 834.  Keeping these principles in mind, I turn to an examination of the claims asserted by Jerrell.

**Denial of Counseling Services**

"[The duty to provide adequate] medical care encompasses detainees' psychiatric needs."  *Gibson v. County of Washoe, Nev*., 290 F.3d 1175, 1187 (9th Cir. 2002)(citations omitted); *see also Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir.1995)("Prison staff violate the Eighth Amendment

-13-

if they are deliberately indifferent to an inmate's serious mental-health-care needs"). Obviously, a psychiatric or mental condition can constitute a serious medical need and pose a risk of serious harm. *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000).

In this case, Jerrell maintains he was told the WCDC would not transport inmates for counseling services. He supports this claim with his own testimony and with an exhibit consisting of a single page from his OGC records, dated December 31, 2008, that contains the following statement by Sally Micheli, a licensed clinical social worker: "Called Washington County to confirm appt time [February 3rd at 10:00 a.m.] and they responded that unless it concerns crisis and medication they will not provide transportation for couns[e]ling." *Defts' Ex.* 26.

There is no information on who Micheli spoke with at the WCDC. There is nothing to suggest that she spoke with either of the Defendants. There is nothing to suggest either Defendant was personally involved in allegedly denying Jerrell transport for counseling services. Further, while Jerrell testified he was not seen by OGC staff on February 3rd, he was transported to OGC. *See Defts' Ex.* 30. With the exception of Jerrell, no witness testified to the existence of this policy. There is simply no evidence of deliberate indifference on the part of the Defendants.

**Denial of Dental Care**

Dr. Howard, on December 9, 2008, noted the tooth needed to be extracted and the gum was swollen. An antibiotic was prescribed. In other words, Dr. Howard's medical opinion was that Jerrell was in need of dental treatment.

That same day, Jerrell was placed on the list to see the dentist, *Defts' Ex.* 41 at pg. 1. Nurse Bradley testified that no individual appointments were made with the dentist. The WCDC worked with only a single dentist and had no set schedule for when inmates would be seen. Reference to

-14-

the dental list establishes some inmates waited only a couple of weeks to be seen while others waited months for their name to come up on the list. *See e.g., Defts' Ex.* 41 (Inmate Ledgerwood put on list 10/14/08 and seen on 10/31/08; Inmate Clark put on list 11/11/08 and seen on 1/16/09 ). Nurse Bradley testified the dentist saw no inmates from March 27th to May 21st.

The severity of an inmate's dental problems were not considered. The only factor considered was the date inmates were placed on the list. If an inmate was not available on a given date, he was skipped and he was next in line to see a dentist. This, however, did not happen in Jerrell's case. By itself, the error in skipping over Jerrell's name and failing to recognize by reference to the list that Jerrell had not received dental care amounts to negligence. *Cf. Beers v. Stockton*, 242 F.3d 373 (8th Cir. 2000)(failure to discover until months later that physician had been unaware of certain medical records amounted to negligence on the part of the nurse in failing to ensure physician reviewed records).

However, Dr. Beavers rendered dental treatment to inmates on February 4th, February 11th, February 18th, February 20, and February 25th.

Jerrell continued to suffer from dental pain:

March 1, 2009, toothache--an incident report prepared noting Jerrell's tooth was black in the middle and the gums were red and swollen, *Plff's Ex.* 7 at pg. marked 68 of 96;

on March 1, 2009, requesting some Aleve for his abscessed tooth, *Id.* at pg. marked 81 of 96;

on April 14, 2009, he was seen for a toothache and prescribed an antibiotic and Ibuprofen, *Id.* at pg. marked 72 of 96;

on April 15, 2009, asking when he would get to see the dentist. Jerrell states that he had been told four or five months ago that he would get to see the dentist. He indicated his tooth had continued to deteriorate, *Id.* at pg. marked 91 of 96;

on May 7, 2009, complained of a severe toothache and red swollen gums. He indicated it had now been six months and he still hadn't seen the dentist. In response, he was told he was on the next available appointment list, *Id.* at pg. marked 90 of 96;

on May 7, 2009, asked if he would be getting a special tray since he could not chew any food, *Id.* at pg. marked 96 of 96;

on May 11, 2009, he indicated he was scheduled to see the doctor about his tooth and to get back on antibiotics. Jerrell indicated he believed the abscess tooth has made him sick with headaches and body aches, *Id.* at pg. marked 85 of 96;

on May 12th, Jerrell was seen and again prescribed an antibiotic, *Id.* at pg. marked 73 of 96;

on May 17th, Jerrell complained that Nurse Rhonda told him a month ago that he would be put back on the dentist list and it would not be long before he got to go to the dentist. He stated he was still in severe pain from his abscessed wisdom tooth, *Id.* at pg. marked 93 of 96;

on May 25th, stating he had been waiting almost six months to see the dentist and had been assured several times by Nurse Bradley that he would get to see a dentist. His tooth is "very bad & very painful." In response, Nurse Bradley stated the ADC had denied his request for dental treatment and advised he would be evaluated on intake, *Id.* at pg. marked 92 of 96;

While the "Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish," *Jenkins v. County of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009), a delay in treatment, when coupled with the knowledge the inmate is suffering, can support a finding of deliberate indifference, *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995). Here, the record clearly establishes that in early December of 2008 it was concluded dental care was needed. Despite this need and Jerrell's continued complaints regarding the toothache, Jerrell did not receive dental care during his incarceration at the WCDC. Once the ADC denied pre-approval for the dental treatment, the WCDC practice, at that time, was to deny all dental treatment. In short, at that stage, the WCDC ignored their constitutional duty to provide adequate dental care to inmates in their custody.

-16-

I believe the evidence establishes that Nurse Bradley exhibited deliberate indifference to Jerrell's serious dental need. As noted above, she became aware of his need for dental care by December 9, 2008, at the latest. Despite Jerrell's continual complaints about not receiving dental treatment, she did not follow-up or take any steps to ensure that he received that care in a reasonable amount of time. Once the ADC denied the treatment, she stopped any efforts to get Jerrell to a dentist. By virtue of his incarceration, Jerrell had no way of obtaining dental care himself.

With respect to Sheriff Helder, there is no evidence to show he was personally involved in any decision with respect to the medical or dental care to be given Jerrell or that he even knew of Jerrell's need for dental care. *Langford v. Norris*, 614 F.3d 445, 460-61 (8th Cir. 2010)(a supervisor may be held personally liable if he knew that an inmate's serious medical needs were not being adequately treatment and remained indifferent). Similarly, the evidence presented established Sheriff Helder was unaware of Captain Osborne "practice" of refusing treatment of ADC committed inmates if the ADC did not authorize the treatment.

### Denial of Medical Care--September 2008 Incarceration

There is no evidence of deliberate indifference on the part of Nurse Bradley or Sheriff Helder during this incarceration. Neither were personally involved in deciding what care Jerrell should receive and there is no evidence they were even aware of his medical needs.

### Denial of Medical Care--November 2008 Incarceration

Other than the separately addressed claims of denial of counseling services and of dental care, there is no evidence to suggest either Nurse Bradley or Sheriff Helder acted with deliberate indifference to Jerrell's need for medical care. Jerrell was seen by the nurse or doctor on a number of occasions. His medical needs were addressed although not necessarily in the way he believed they

-17-

should be. *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010)("prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fails to rise to the level of a constitutional violation.

### Damages on the Denial of Medical Care Claim

As noted above, we have concluded Nurse Bradley exhibited deliberate indifference to Jerrell's serious need for dental care. Compensatory damages under § 1983 are governed by general tort-law compensation theory. *See Carey v. Piphus*, 435 U.S. 247, 255 (1978). In *Carey*, the Supreme Court noted that damages are available under § 1983 for actions "found . . . to have been violative of . . . constitutional rights and to have caused compensable injury." Id. (internal quotation marks and citations omitted). The fact that an Eighth Amendment violation has occurred "does not mean that [Jerrell] suffered substantial compensable damages that could be measured accurately." *Warren v. Fanning*, 950 F.2d 1370, 1374 (8th Cir. 1991). The trier of fact "is required to award nominal damages once it has found cruel and unusual punishment if it has not been able to convert into dollars the injury and pain a plaintiff has suffered." *Cowans v. Wyrick*, 862 F.2d 697, 699 (8th Cir. 1988).

In this case, some delay in the receipt of dental care would necessarily occur because the WCDC medical staff does not include any dentists. However, in Jerrell's case he went from December 9th, when his dental needs were recognized, to June 11th when he was transferred to the ADC, without receiving any dental care. During this time, he complained of dental pain, the tooth being abscessed, and an inability to eat due to the dental problem. Under these circumstances, I believe it is appropriate to award damages from January 16th. As pain and suffering is not capable of exact measurement, I believe Jerrell should receive an award of compensatory damages on a per

day basis.  He will be awarded $100 per day for the one-hundred and forty- seven days--January 16th to June 11th.

With regard to punitive damages, punitive damages may be awarded at the discretion of the fact-finder once sufficiently serious misconduct by one or more of the Defendants is shown to exist. *Smith v. Wade*, 461 U.S. 30, 52 (1983).  The purpose of punitive damages is to punish the Defendants and/or deter similar conduct in the future.  *See Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 19-20 (1991).   In § 1983 cases, it has been said that punitive damages are appropriate "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Walters v. Grossheim*, 990 F.2d 381, 385 (8th Cir. 1993)(internal quotation marks and citation omitted).

Having given careful consideration to the testimony elicited at the evidentiary hearing, I conclude Jerrell is not entitled to an award of punitive damages.  There is no evidence to suggest Nurse Bradley's conduct met the standard required to assess punitive damages.

### 3.  Conclusion

For the reasons stated, judgment will be entered in favor of the Plaintiff on his denial of dental care claim.  Plaintiff will be awarded judgment in the amount of $14,700 against Defendant Nurse Rhonda Bradley.

DATED this 6th day of June 2011.

/s/ *J. Marschewski*

 HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE